UNITED STATES v. VACUUM OIL CO.

SAME v. STANDARD OIL CO. OF NEW YORK (two cases).

(District Court, W. D. New York. March 29, 1907.)

Nos. 420, 421, 422.

1. CARRIERS—VIOLATION OF INTERSTATE COMMERCE ACT—DEPARTURE FROM PUBLISHED ACTS.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], as supplemented by the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]), an initial carrier which has become a party to a joint through-rate for the transportation of property over its own and connecting lines between two points in different states, which rate has been filed and published as required by the act, cannot lawfully transport property between such points at a less and unpublished rate over another route and with different connections.

2. SAME—INDICTMENT FOR RECEIVING CONCESSIONS IN RATES—SUFFICIENCY.

An indictment under the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]), charging a shipper with having received a rebate or concession from the joint rate published and filed

by a carrier for the transportation of property between points in different states, is not defective because it does not specifically charge that such rate was required to be filed by the statute, where it alleges that it was published and filed as required by law, nor because it does not charge that the defendant solicited the concession, nor need it name any other shipper who has been charged and paid the higher rate as is required where discrimination is charged, or that any shipment was actually made at the published rate.

**3. SAME.**

Because an indictment under the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]), for receiving a concession from the published rate on an interstate shipment of property alleges that such shipment was made in car load lots, or in cars not owned by the carrier, it does not follow as matter of law that such fact justified the departure from the published rate so as to render the indictment demurrable.

**4. SAME—DISCRIMINATION IN RATES—CONSTRUCTION OF STATUTE.**

In considering the sufficiency of an indictment for receiving an unjust discrimination in rates from a carrier on an interstate shipment of property in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], as supplemented by the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]), any doubts as to the correct construction of the statute should be resolved in favor of the evident intention of Congress that equality among shippers should be maintained, and unjust discrimination and favoritism of all kinds condemned, leaving the question whether the existing conditions justified the difference in rates charged to be determined as one of fact on the trial.

**5. SAME—SCOPE OF STATUTE.**

The Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]), is not restricted in its provisions to departures from an established tariff rate, but is violated if any other advantage is given to a shipper whereby a discrimination is practiced.

On Demurrers to Indictments.

Charles H. Brown and S. Wallace Dempsey, for the United States. John G. Milburn, Martin Carey, and J. McC. Mitchell, for demurrants.

HAZEL, District Judge. The indictments, Nos. 420, 421, and 422, allege violations by the Vacuum Oil Company and the Standard Oil Company of New York of the act to regulate commerce and its amendments, including the so-called "Elkins Act," passed February 19, 1903. Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 601]. The demurrers interposed to said indictments were practically argued at the same time. The cases involved similar transactions and legal questions, and will therefore be considered together.

It is commonly understood that the object of the interstate commerce act was to correct abuses which were being practiced in matters of transportation, and to prevent unjust discrimination between shippers and establish uniform and reasonable freight rates. Congress, from motives of public welfare, has thought necessary to regulate the established tariff rates for transporting property interstate, and by section 2 of the act of 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3155]) provided:

"That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed to be guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

To compel strict adherence to the mandate of Congress the Elkins act was subsequently passed, section 1 of which says:

"It shall be unlawful for any person, persons or corporation to offer, grant, or give or to solicit, accept or receive any rebate, concession or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced."

## The Rutland Indictments.

The indictments (Nos. 420, 422) charge the defendants, Standard Oil Company of New York and Vacuum Oil Company, with having knowingly received from the Pennsylvania Railroad Company, a corporation subject to the provisions of the interstate commerce act, concessions whereby certain shipments of petroleum from Olean, in the state of New York, to Rutland, in the state of Vermont, were transported at a less rate than that named in the tariff of rates established by such carrier as prescribed by said act. It is alleged that from January 1, 1904, to May 1, 1905, said carrier was engaged in the transportation of property from Olean, N. Y., to Genesee Junction, N. Y., under a common arrangement with the New York Central & Hudson River Railroad Company, the Boston & Maine Railroad Company, and the Rutland Railroad Company for a continuous or through shipment to Rutland, Vt., and kept open for public inspection and had filed with the Interstate Commerce Commission its established tariff of rates for transporting petroleum at 19 cents per 100 pounds from Olean to Rutland by the said route; that, while such rate was in force, the Pennsylvania Railroad Company transported petroleum in tank cars for the defendants from Olean to Rutland, over another route, the Pennsylvania Railroad Company, the New York Central & Hudson River Railroad Company, and the Rutland Railroad Company, at the tariff rate of 16.1 cents per 100 pounds; that such shipment was under a common arrangement between said three railroad companies for a through and continuous shipment from the point where the commodity was placed in the cars; that such shipment was accompanied by shipping orders indicating the distances and manner of transportation.

The defendants demur to the indictments on the grounds that the offense is not sufficiently described therein, and that the facts stated do not constitute a crime, and urge numerous objections attacking the validity thereof. It is claimed that the indictments do not charge the

character and description of the published tariff of rates—that is, whether the rate was for shipments in car load lots or in cars supplied by the shipper—that shipments were ever made at the 19-cent rate from Olean to Rutland; that the rate paid was not published and filed as required by the act; that the tariff charges paid were not the established rates between the termini specified in the indictment; that such rate was not known or open to all shippers; and, finally, that the indictment is defective, in that it fails to charge that the 16.1 rate was made by the Pennsylvania Railroad Company at the request of the defendant.

The principal objection is that the fact that the defendants received a less rate by one route between two stated points than that in force between the same termini over a different route does not constitute a concession; and in support of this proposition defendants cite Interstate Commerce Commission v. Alabama & Midland Ry. Co., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414, and Atchison, Topeka & Santa Fé R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291. In the first-mentioned case the Supreme Court construed section 2 of the act of 1887, holding it of sufficient scope to compel equality between shippers over the same line and to prohibit any rebate or other device by which freight is transported by a different shipper at different rates for the same distances over the same line; the circumstances and conditions not being dissimilar. Apparently the gist of the decision is found in the statement of the court that the words "under substantially similar circumstances and conditions" in section 2 are inapplicable to competing lines, but are restricted to matters of carriage. In the latter case the question related to charging different rates over different routes between similar points where connecting arrangements have been made for joint carriage. The court held that the Constitution of the state of Colorado forbidding discrimination in rates was not violated by the railroad company refusing to give a connecting road the same arrangement as to through rates as those given to another connecting line; the conditions as to the transportation being substantially alike in both cases. These cases are not helpful to a decision of the proposition under consideration.

Before proceeding further in the consideration of the objections raised by the demurrers, an answer to the inquiry, Who are amenable to the interstate commerce act? may simplify the discussion by the court. Concededly two classes of carriers come within its scope—carriers engaged in interstate commerce having independent facilities for through carriage from a point in a state to a point in another state and carriers which have entered into a compact establishing a joint traffic rate, the shipments being interstate over through or continuous lines. The defendants claim that a common carrier subject to the provisions of the act which has established a joint traffic arrangement does not offend against the statute if the property is carried between termini over another and different connecting route; that section 6 of the act of 1887, read in connection with section 2 thereof, relates specifically to common carriers having through lines. To enforce this point reference is made to that portion of section 6 which reads:

"And in cases where passengers and freight pass over continuous lines ·or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates or fares or charges for such continuous lines or routes, copies of such joint tariffs shall also, in like manner, be filed with said commission."

And the following provision:

"It shall be unlawful for any common carrier, party to any joint tariff, to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of persons or property, or for any services in connection therewith, between any points as to which a joint rate, fare or charge is named thereon than is specified in the schedule filed with the Commission in force at the time."

At the argument emphasis was laid by counsel for the defendants upon the words "for any service in connection therewith between any points as to which a joint tariff is named thereon," as indicating that there must be a deviation from joint tariff rates on the established route, as distinguished from a shipment of property over any connecting road for which no joint tariff arrangement has been published and filed. The contention for such an interpretation of sections 2 and 6 is thought to be clearly answered by the provisions of the Elkins act, which, in unambiguous terms, is declaratory of the illegality of giving or accepting any concession or discrimination in respect to the interstate shipment of freight whereby the result therein forbidden is accomplished. If the claim of the defendants upon this point were to prevail, a carrier having other connecting facilities may conform to the provisions of the statute when it chooses, and remain at liberty to exact the established joint rate from one shipper and transport the goods interstate of a more favored shipper at a cheaper rate over another connecting line or route. The initial carrier, possessing facilities for connecting with different routes to transport the petroleum in question, undoubtedly could ignore the established rate and carry such commodity over any connecting route, but it could not, within the intent and spirit of the interstate commerce act, charge or exact in arrangement with such connecting lines a less sum or rate for transportation than that which had been established. In other words, the initial carrier, when it has once established a joint traffic compact to transport property over a certain route between points in different states, cannot transport over any connecting route pursuant to traffic ·arrangement at a less rate than that published and filed in conformity with the tariff act. If the contention of the defendants is sound, the intent of Congress is not expressed in the act, the remedial purpose of the statute is defeated, and its provisions would secure to favored shippers the intolerable advantages and discriminations which it was enacted to prevent. The intent of Congress must be ascertained from a consideration of the entire act. The evil sought to be remedied must always be considered, and in the act to regulate commerce the desideratum was the eradication of such evil practices as resulted in the carriage interstate of goods belonging to powerful interests· or industries to the detriment of less favored shippers. The decision of the Supreme Court in New York, N. H. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515, bears upon

the scope of the enactment. There the question was whether a carrier engaged in interstate traffic and also a dealer in the merchandise transported comes within its provisions. It was urged that as the act did not expressly forbid carriers becoming dealers in the commodity transported by them the enforcement of its requirements would result in prohibiting a carrier from becoming such dealer. But the Supreme Court stated:

"Because no express provision against a carrier who engages in interstate commerce becoming a dealer in commodities moving in such commerce is found in the act, it does not follow that the provisions which are expressed in that act should not apply and be given their lawful effect."

The court held that, even though compliance with the act necessitated a discontinuance of the mercantile pursuit in which the carrier engaged, it nevertheless could not be relieved from the operation of the statute. Applying this principle to the cases under consideration, the fact that the indictments do not specify whether the shipments were in cars furnished by the shipper, or, in view of the published tariff of rates, that such shipments may not consist of the sum of the locals, is thought immaterial, and the omission to allege such facts will not enable the accused to escape liability for the accomplishment of the prohibited result. In my opinion if a railroad company has entered into an arrangement with connecting carrier companies to transport property on a through line between two points situated in different states, charges for transportation being agreed upon, and copies of such joint tariff of rates being filed and published in conformity with the provisions of the act, the initial carrier, intending to evade the provisions of the act by which a uniformity of rates to all shippers is established, cannot legally transport property at a less rate over other connecting roads between the same termini. Such I conceive was also the decision in United States v. Standard Oil Company (D. C.) 148 Fed. 719. Upon this point Judge Landis vigorously states:

"It is written in every section and line of the law that the thing sought by Congress was a fixed rate, absolutely, unvaryingly uniform, to be adhered to until publicly changed in the manner provided by law. The thing prohibited was the departure from that rate by any means whatsoever, whether direct between the parties or indirect by the employment of the most deviously circuitous subterfuge."

It is true that the established rate may be increased or decreased and other arrangements for continuous carriage of merchandise may be entered into, but this can only be done upon compliance with the provisions of the act relating to a joint tariff compact and publication of change in rates.

The point that section 6 does not require the publication and filing of a joint rate, but relates only to the initial carrier's line, and that the indictment is defective because it does not specifically charge such requirement, is untenable. The allegations in the indictments that the tariffs were published and filed as required by law would seem to justify the presumption that such publication and filing were pursuant to the direction of the Interstate Commerce Commission.

The next point is that the conditions of the shipments complained of were dissimilar; that the published rate was for less than car loads

or in special cars furnished by the shipper. This question is thought to be a matter of defense, and may await the trial of the case.

It is further urged that no shipper is named in the indictment who was required to pay a different rate over the so-called "Norwood Route." This omission is not thought to be a defect in pleading. In United States v. Hanley (D. C.) 71 Fed. 672, cited by defendants, the indictment charged discrimination between shippers, and it was held that the indictment must allege that some other person designated in the indictment had been charged a higher rate. The court substantially stated that the crime of unlawful discrimination under section 2 of the act necessarily involved two shipments, one of which fared better than the other, when both should have fared alike; the character of the shipments not being dissimilar. It will be observed that the proposition with which we are here concerned is not whether the defendants have been benefited by an unjust discrimination as against other shippers over the same route, but have the defendants been given a concession from the published tariff rate, a rate of which the public is presumed to have knowledge and upon which other shippers of petroleum have a right to place reliance. The word "concession" does not appear in the earlier acts to regulate commerce, but is used for the first time in section 1 of the Elkins act, which is apparently a "catchall" provision for any practice by either carrier or shipper which by any device whatever would tend to defeat the purpose of the law. The term "concession" does not necessarily imply that the shipper solicited a concession or privilege which the carrier could give. The statute is clearly violated if the defendant has accepted or received any concession or discrimination which resulted in the carriage of the freight in question at a less rate than that established under the act. If, notwithstanding the published rate, there was in fact no concession given or there was no legal departure from the published rate, the defendants cannot complain of unjust treatment if they are required to prove the fact upon the trial. Nor, in my judgment, was it necessary to allege in the indictment that a shipment at the 19-cent rate was actually ever made. The legal rate according to the indictment was published and filed, and, as already stated, shippers of freight are presumed to have derived their knowledge of freight rates between the points in controversy from such publication. The presumption that the asserted sum of the locals rate paid was duly published or filed is not warranted because the failure to publish such rate is not affirmatively set forth in the indictment. It is not controverted that there are occasions when a reasonable departure in rates is permissible, as, for instance, when the conditions of shipment are essentially different, but whether the circumstances and conditions of the shipment permitted the carrier to charge a less rate than that published and filed is not a question for present determination. It does not follow as a matter of law that because the indictment alleges that the commodity was transported in a car owned by the Union Tank Line, or that the shipment was in bulk, that such conditions and circumstances warranted a rate less than the established rate or were such as to exonerate the accused from responsibility. It follows from what has been said that a prima facie

intraction of section 1 of the Elkins act is alleged in the indictments, and is therein set forth with sufficient precision.

The demurrers are overruled.

## The Burlington Indictment, No. 421.

The Burlington indictment has 123 counts, and charges the defendant, the Standard Oil Company of New York, with having knowingly received an unjust discrimination from the Pennsylvania Railroad Company in relation to the shipment of certain petroleum from Olean, N. Y., to Burlington, Vt., in violation of section 1 of the Elkins act. Concededly the vital question involved is whether a discrimination between localities or a discrimination between shippers is charged. By section 2 of the act to regulate commerce it is made an offense for a carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for transporting any freight than it receives from any other person for doing a like and contemporaneous service in the transportation of a like kind of property under substantially similar circumstances and conditions. Under the Elkins act the person or corporation who receives a discrimination in his favor offends against the statute. The gist of the offense described by section 2 is the payment of a different rate for performing a like service; the traffic being the same, under substantially the same conditions and circumstances. By section 3 of the act of 1887, undue and unreasonable preferences and advantages to any shipper or locality are forbidden. This section is broader than section 2, and includes the questions of reasonableness or unreasonableness of rates charged and any advantages in facilities and conveniences given or received. United States v. Delaware, L. & W. R. Co. (C. C.) 40 Fed. 101.

Having become acquainted with the pertinent clauses of the act, we may briefly examine the salient allegations of the indictment. It is alleged that the initial carrier, the Pennsylvania Railroad Company, pursuant to a common arrangement with the New York Central & Hudson River Railroad Company, the Rutland Railroad Company, and the Central Vermont Railway Company, connecting carriers, transported petroleum for the defendant from Olean, N. Y., to Burlington, Vt. (468 miles distant), at the agreed rate of 17.8 cents per 100 pounds, and refused to accept at said rate any petroleum for transportation from shippers located in Bradford and certain other towns in Pennsylvania, mentioned in the indictment, which are farther distant from Burlington than Olean, from 20 to 136 miles, or at a proportionately greater rate based upon their greater distances from Burlington; that the carriers which had made a traffic arrangement for a continuous transportation of petroleum from Olean to Burlington refused to accept shipments to Burlington from such other places and localities (other than Olean) at a less rate than 33 cents per 100 pounds; that the circumstances and conditions of the transportation of oil from said places to Burlington were substantially similar to the existing conditions and circumstances surrounding the transportation of such commodity from Olean to Burlington. The indictment further charges

that shippers from towns and localities in the state of Pennsylvania, except Bradford, were charged for forwarding property to points in other states located in a southerly or westerly direction from Olean, except petroleum, the same tariff rates as were exacted from shippers from Olean, while shippers from Bradford of goods, except petroleum, were charged the same tariff rates for forwarding in all directions as were charged shippers from Olean. That the relatively excessive rates come within the purview of the act to regulate commerce is not seriously disputed; but it is vigorously contended that it was not an unjust discrimination against shippers at the various points specified, as that term is legally defined. The argument proceeds upon the theory that the recitals in the indictment are in the nature of an offense by the carriers against the localities and places mentioned therein which is forbidden by section 3, and therefore the indictment on its face is defective and must be dismissed. After painstaking consideration of the problems and difficulties presented by counsel for defendant, I have reached the conclusion that any doubts that I may have in relation to the correct interpretation of the statute must be resolved in favor of the evident intendment of Congress, namely, that equality among shippers should be maintained, and unjust discrimination and favoritism of all kinds condemned.

It is undeniable that the defendant may prove at the trial that the conditions and circumstances of the shipments from Bradford and the other points specified in the indictment to Burlington were, in fact, essentially different from what they were from Olean. The higher rate charged at other points, it is true, may be due to the increased distance, the greater expense in transportation, to difficulties in loading on cars, or because the territory is mountainous or the grade tortuous. Such, however, are questions of fact, and, if these conditions actually existed, the departure in the rates would probably be explained. In other words, as was said by Judge Shipman in Interstate Commerce Commission v. Texas & Pac. Ry. Co., 57 Fed. 948, 6 C. C. A. 653:

"While it is true that under sections 2 and 4 of the statute substantially dissimilar conditions may justify dissimilarity in rates, it does not follow that any dissimilar condition, of whatever kind it may be, justifies any discrepancy in rates."

And further in the opinion he states in effect that, though dissimilar conditions create dissimilarity in rates, yet the amount of dissimilarity in rates is of importance. The defendant, however, contends that, as no discrimination between shippers is directly charged, its criminality must rest upon the doctrine enunciated by Judge Brewer in Tozer v. United States (C. C.) 52 Fed. 917, that, where the rate charged is unreasonable, the fact of the unreasonableness must first be established by a jury before an indictment such as this can be sustained. I think the principle of the Tozer Case is inapplicable. In that case no standard was alleged in the indictment by which it could be perceived of what the alleged unlawful act actually consisted. The Court of Appeals, reversing the conviction of the lower court, held that the tariff of rates for a continuous shipment from Chicago to Hepler via Hannibal was not controlled by the sum of the locals

rate, and that such rate was not the standard by which a violation of section 3 could be determined. I think the case of Texas & Pac. Railway Co. v. Abilene Cotton Oil Co. (recently decided by the Supreme Court of the United States), 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. ——, and to which my attention has been called subsequent to the argument, may also be distinguished from the case at bar. In this case the indictment alleges that there were shippers at Bradford and other localities named therein who would have shipped petroleum from such localities to Burlington if it were not for the excessive rate demanded, and that such shipments would have been under substantially similar circumstances and conditions to those from Olean, and, furthermore, that shippers from Bradford were charged the same forwarding or carrying rates on all traffic except petroleum in all directions as were charged shippers from Olean. Whether the existing conditions justified a dissimilarity of rates such as the carriers choose to make must be determined as a question of fact on the trial. It is true that in the case of Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, the Supreme Court declared that section 2 prohibited any "rebate or other device by which two shippers shipping over the same line, the same distance, under the same circumstances of carriage are compelled to pay different prices therefor." And, while this holding would seem to support the view that the shipment must be "the same distance" as that phrase is literally understood, still when applied to the transportation of freight, such a construction is thought to be too narrow. The court does not say that there must be the same mileage distance. If it is true that Bradford was regarded by the carriers as being practically in the same freight zone, then it is apparent that the ordinary signification of the phrase quoted is of latitudinal extent, and does not imply any precise space or limits between different points. The signification of the phrase, therefore, "between carrying points," must be governed by what is commonly understood between carriers.

In United States v. Hanley (D. C.) 71 Fed. 674, it was held that, to substantiate the offense under section 2, there must be two shippers, one receiving a more advantageous rate than the other. It is true that in this indictment no instance of a shipment from Bradford and the other localities to Burlington at the greater rate quoted is shown, but it sufficiently appears that there were other refiners located at the points mentioned who were competitors of the defendant who would have shipped to Burlington had the rates been equal. In this respect the Hanley Case is distinguishable; and, the admitted facts being different, it is not a controlling authority upon the question under consideration.

The next point is that the indictment is defective because it does not allege a departure from a tariff rate printed and filed in accordance with section 6. The Elkins act, however, is not restricted to alleged departures from an established tariff rate, but the statute is violated if any other advantage is given to a shipper whereby a discrimination is practiced. So that, notwithstanding a schedule of rates may have been published and filed in accordance with the law. as the acceptance by a shipper of a concession or discrimination is

expressly forbidden, it would seem to be immaterial whether the 17-cent rate was or was not published and filed. The cases cited by counsel for the defendant (Van Patten v. Chicago, etc., R. Co. [C. C.] 81 Fed. 545, and Winsor Coal Co. v. Chicago, etc., R. Co. [C. C.] 52 Fed. 716) are not thought to apply, as the Elkins act in terms substantially provides that, irrespective of the publication or filing of the schedule of rates, a liability under its provisions may arise whenever the property is transported "by any device whatever * * * whereby any other advantage is given or discrimination practiced." Upon this point the defendant urges in argument that if the indictment is held by the court to properly charge the defendant with having accepted an unjust discrimination, and if it be assumed that the rate was published and filed as required by the act, there being no negative allegation of filing in the indictment, then the shipper before making the shipment is required to take into consideration a number of troublesome elements, such as distances, conditions of shipments between stated localities, and he would also be burdened with the onus of ascertaining before shipment that there was no discrimination against shippers in other localities. The argument presented upon this point is not strictly warranted by the alleged facts which are admitted by the demurrer. Even though the indictment fails to charge the filing and publication of the 17-cent rate, it nevertheless alleges that the 33-cent rate from Bradford and other localities was quoted to shippers at those points, and that the carrier refused to accept shipments of oil from shippers at such points at a rate less than 33 cents, all of which was known to the defendant. In these circumstances it may be presumed that the defendant had knowledge that oil producers in the localities specified in the indictment, except Olean, were absolutely prevented from shipping their commodity to Burlington in competition with defendant because of the unjust, extortionate, and discriminating freight charges demanded by the carrier of other shippers. It may be presumed that the Standard Oil Company was aware that it received an advantage such as enabled it to dispose of its commodity in the Burlington market, to the detriment and exclusion of other shippers. It may be presumed that it knew that the difference between the rate paid by it and the 33-cent rate quoted to other shippers was relatively too high, and that no reasonable differential was made by the carrier. The acceptance of such advantages manifestly evidenced a favoritism which is abhorred by the interstate commerce act, and in the situation presented the defendant must be held to have unlawfully received a discrimination or concession in its favor.

The demurrer is overruled.